1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   WILLIAM M. DOUGHTIE,                    No. CIV S-06-1695-FCD-CMK-P

12                    Petitioner,

13         vs.                               <u>FINDINGS AND RECOMMENDATIONS</u>

14   L.E. SCRIBNER, et al.,

15                    Respondents.

16   _____/

17              Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court are petitioner's petition

19   for a writ of habeas corpus (Doc. 1), filed on August 1, 2006, respondent's answer (Doc. 14),

20   filed on November 28, 2006, and petitioner's reply (Doc. 16), filed on January 8, 2006.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

1

# I. BACKGROUND

A.    **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

### *The Prosecution's Case*

A., born in October 1988, is the daughter of P.D., who married defendant when A. was four and one-half hears old.  Defendant separated from P.D. in April 2001 but remained in contact with A.

According to A., defendant "inappropriately" touched her "maybe 80 to 100" times, although "[i]t could have been more than that" because "it was a long time ago."  About 70 to 80 percent of those times, defendant's fingers went inside her vagina.

The first incident occurred in Yucaipa when A. was "probably four or five."  Defendant blindfolded her and said they were going to play a guessing game.  He put his penis in her mouth and told her it was a pickle.

The family eventually moved to Bomark Way in Sacramento.  In the back yard of the house, defendant built a wood fort and placed inside of it a foam mattress and blankets.  When A. was seven or eight years old, defendant took her inside the fort and touched her vagina under and over her clothes.

When A. was in fourth grade and was eight or nine years old, the family moved to Greenlawn Way where they lived until she was in eighth grade.  "A majority of what happened happened at that address," which was approximately 80 to 85 percent of the touchings.  Most of these incidents involved defendant rubbing A.'s vagina both inside and outside her clothes after everyone else had gone to bed.

When A. was in the seventh grade and was either 12 or 13 years old, defendant took her into her mother's bedroom and tried to take off A.'s overalls.  While he and A. were fighting, defendant ripped the button holes on her overalls, "French kissed" her, and touched her "boobs" and vagina over her clothes.

Approximately one week later, defendant French kissed A. again and got into a "shoving match" with her when he tried to rip off her clothes.  Defendant hit A. in the face, giving her a black eye.  She told her mother she got the black eye in basketball practice.

During Christmas of 2000, defendant came into A.'s bed and "started rubbing on [her]."  He put his mouth on her vagina through her clothes and "breathed on [her] for a few minutes."

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

In April of 2001 defendant separated from A.'s mother. The molests continued. That Easter, while at A.'s grandparents' home in Mt. Lassen, defendant took off A.'s overalls and touched her vagina.

During Christmas 2001, when A. was in the eighth grade and was 13 or 14 years old, she went to her uncle Al and Aunt Darlene's house. Defendant sat down on the couch, pulled her on top of him, and touched her "boobs" and French kissed her. When A. stopped defendant from taking off her bra, he told her he was doing "these things" to show her "how to act when boys wanted to do those things with [her] when [she] got older." He added that "he would feel comfortable doing anything with [her] that [she] had questions about besides actually having sex with [her]."

In April 2003, when A. was 14 years old, defendant called her "out of the blue" on her cellular phone and said he would pick her up after school. After they ate at Taco Bell, he suggested they "roll through the park naked together." A. told him he was "nasty." Defendant then took her to a shopping mall where he bought her a pair of $75 tennis shoes. In the car, defendant told her that he wanted $75 worth of kisses and, that for $75, she "should probably even suck his dick." A. refused and told him to take her home. That was the last incident between them.

A. waited until ninth grade to tell a friend about the molests. She had not previously disclosed the molestation because defendant had told her not to tell and she was scared because he had a temper. He was also the only "dad" she had ever had and [she] thought "[m]aybe that's what dads were supposed to do."

In the summer between ninth and tenth grade, A. and her mother "got in a really big argument." A.'s mother commented that A. should live with defendant until they both "cooled down." A. responded, "why, so he can molest me some more[?]" A.'s mother did not call the police.

Two days later, A. and her brother went to Colorado to visit their grandparents for two months. While in Colorado, A. called her mother and told her she wanted to "press charges" against defendant when she got back.

A couple of months later when they returned, A. complained to her mother that she had not done anything about what A. had told her. It was then they called police.

The next day A. told a police officer that defendant had molested her 30 times. A month or two later, after thinking more about it, she told Detective Mary Saporito that defendant had molested her 80 to 100 times and that she struggled or fought back 30 to 40 percent of the time.

On December 3, 2003, Detective Saporito set up a pretext telephone call between A. and defendant. During the call, defendant denied he had stuck his penis in A.'s mouth when she was blindfolded, denied he had given her a black eye, and denied he had put his fingers in her vagina. He admitted he may have touched her vagina in a nonsexual way once when she was taking a bath and apologized if he had "ever touched [her] inappropriately." He explained that "sometimes . . . a parent likes to feel more loved" and that "it sounds sickening, and it sounds wrong and all this."

///

3

On December 5, 2003, Detective Saporito conducted a videotaped interview with defendant in the sheriff's office.  Defendant initially denied he had molested A.  When told his voice stress analysis "showed deception," he admitted he had French kissed A. and stuck his fingers in her vagina "maybe 10 to 20 times."

### The Defense

Dr. Richard Leo, an associate professor of psychology and criminology, testified regarding false confessions and the tactics of police interrogation.  There were "several hundred documented cases" of false confessions, some of which occurred when people who initially claimed innocence became temporarily convinced they "did it" after continually being accused of the crime.

Defendant testified that during the interview with Detective Saporito, he had no memory of kissing A. or putting his fingers in his vagina.  He only was repeating what the detective had told him.  At trial, he denied ever touching A. "with the intent of gratifying [his] own sexual pleasure[s]."

## B.   Procedural History

Following a jury trial, petitioner was convicted of one count of committing a lewd and lascivious act upon a child under the age of 14 years, and 19 counts of committing a lewd and lascivious act upon a child under the age of 14 years by force or duress.  All 20 counts involved the same victim.  The trial court sentenced petitioner to 3 years for each count – the lower term provided under California's determinate sentencing law.  The trial court imposed "full, separate, and consecutive" terms for each count, for an aggregate sentence of 60 years in prison.  The California Court of Appeal affirmed the conviction and sentence in an opinion issued on January 18, 2006.  On March 29, 2006, the California Supreme Court denied direct review "without prejudice to any relief to which defendant might be entitled" after the United States Supreme Court determines the effect of Blakely v. Washington, 542 U.S. 296 (2004), on California sentencing law.[2]

---

[2]   On January 22, 2007, the Supreme Court, in a 6-3 decision, concluded that California determinate sentencing law was unconstitutional under Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004), to the extent it allows imposition of an aggravated term based on facts found by the judge and not the jury.  See Cunningham v. California, 127 S.Ct. 856 (2007).

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

1             Under § 2254(d), federal habeas relief is available where the state court's decision

2  is "contrary to" or represents an "unreasonable application of" clearly established law.  In

3  <u>Williams v. Taylor</u>, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the

4  Court), the United States Supreme Court explained these different standards.  A state court

5  decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme

6  Court on the same question of law, or if the state court decides the case differently than the

7  Supreme Court has on a set of materially indistinguishable facts.  <u>See id.</u> at 405.  A state court

8  decision is also "contrary to" established law if it applies a rule which contradicts the governing

9  law set forth in Supreme Court cases.  <u>See id.</u>  In sum, the petitioner must demonstrate that

10  Supreme Court precedent requires a contrary outcome because the state court applied the wrong

11  legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court cases

12  to the facts of a particular case is not reviewed under the "contrary to" standard.  <u>See id.</u> at 406.

13  If a state court decision is "contrary to" clearly established law, it is reviewed to determine first

14  whether it resulted in constitutional error.  <u>See</u> <u>Benn v. Lambert</u>, 293 F.3d 1040, 1052 n.6 (9th

15  Cir. 2002).  If so, the next question is whether such error was structural, in which case federal

16  habeas relief is warranted.  <u>See id.</u>  If the error was not structural, the final question is whether

17  the error had a substantial and injurious effect on the verdict, or was harmless.  <u>See id.</u>

18             State court decisions are reviewed under the far more deferential "unreasonable

19  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

20  unreasonably applies the rule to the facts of a particular case.  <u>See id.</u>; <u>see also</u> <u>Wiggins v. Smith</u>,

21  123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in <u>Williams</u>,

22  suggested that federal habeas relief may be available under this standard where the state court

23  either unreasonably extends a legal principle to a new context where it should not apply, or

24  unreasonably refuses to extend that principle to a new context where it should apply.  <u>See</u>

25  <u>Williams</u>, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

26  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

1  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct.

2  1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be

3  found even where the federal habeas court concludes that the state court decision is clearly

4  erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to

5  give proper deference to state courts by conflating error (even clear error) with

6  unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

7  law, where a state court decision is an "unreasonable application of" controlling law, federal

8  habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

9  283 F.3d at 1052 n.6.

10         The "unreasonable application of" standard also applies where the state court

11  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

12  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

13  are considered adjudications on the merits and are, therefore, entitled to deference under the

14  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

15  The federal habeas court assumes that state court applied the correct law and analyzes whether

16  the state court's summary denial was based on an objectively unreasonable application of that

17  law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

18

19                                **III.  DISCUSSION**

20         Petitioner raises two claims in this petition.  First, petitioner argues that his due

21  process rights were violated.  Specifically, he argues:

22             Only five of the twenty counts were based upon evidence of
               specific acts of child molestation; the remaining fifteen counts were based
23             upon "generic" evidence that [petitioner] molested the victim in a similar
               manner on an estimated number of unspecified, separate occasions; those
24             fifteen counts should have been charged as a single violation of [California
               Penal Code] section 288.5, subdivision (a), requiring the reversal of the
25             counts supported only by "generic evidence."

26  / / /

Second, petitioner argues that his right to trial by jury was violated when the court imposed "full, separate, and consecutive" terms for each count. In particular, he asserts that the trial judge – not the jury – made the factual findings necessary to impose such terms.

### A.    Counts Based on Generic Evidence

In rejecting petitioner's due process claim that the convictions are improperly based on "generic evidence," the California Court of Appeal stated:

> There was also no due process violation in charging defendant with multiple counts of lewd and lascivious acts by force or duress. . . . [¶] . . . Our Supreme Court has held that "generic testimony" to support child molestation charges does not deprive a defendant of his due process right to notice of the charges against him and his right to present a defense to those charges. (People v. Jones (1990) 51 Cal.3d 294, 317-321). While the court also explained that for generic testimony to be sufficient, the victim must "describe the kind of act or acts committed with sufficient specificity," "describe the number of acts committed with sufficient certainty," and "describe the general time period in which these acts occurred," it also emphasized that "[a]dditional details regarding the time, place, or circumstances of the various assaults . . . are not essential to sustain a conviction." (citation omitted).
>
> A.'s testimony regarding the molests at the Greenlawn residence satisfied these requirements. She testified that defendant "inappropriately" touched her "maybe 80 to 100" times and that 80 to 85 percent of those touchings occurred at the Greenlawn residence where she lived from fourth to eighth grade. Of the total touchings, 70 to 80 percent of the time defendant's fingers went inside her vagina and 30 to 40 percent of the time she "struggled or fought back." Many of the incidents at the Greenlawn residence involved defendant rubbing her vagina both inside and outside her clothing after everyone else had gone to sleep.

The court concludes that the victim's "generic testimony" did not violate petitioner's due process rights.

In his petition for review to the California Supreme Court, petitioner reproduced verbatim the arguments he presented to the Court of Appeal. Similarly, in the instant petition, petitioner merely attaches his state court briefs. Therefore, this court does not have the advantage of any argument from petitioner as to why the state court's denial of this claim was either contrary to or an unreasonable application of controlling federal law.

///

1    As respondents correctly note, the standard for petitioner's due process claim is

2  that the defendant must be given notice of the charges against him and a fair opportunity to

3  defend against them.  See Chambers v. Mississippi, 410 U.S. 284, 294 (1973).  In opposing

4  petitioner's claim, respondents point to a very similar case in which the Ninth Circuit concluded

5  that the defendant had not been denied either of the Chambers requirements by a statute allowing

6  "generic evidence."  In Brodit v. Chambra, the petitioner had claimed that "he was deprived of

7  notice and a fair opportunity to respond to the state's charges because section 288.5 allowed the

8  state to charge him with three or more acts of sexual abuse occurring on unspecified dates. . . ."

9  350 F.3d 985, 988-89 (9th Cir. 2003).  The Ninth Circuit concluded that the state court's

10  rejecting of Brodit's claim was neither contrary to nor an unreasonable application of United

11  States Supreme Court precedent.  See id.

12    In this case, as in Brodit, the record reflects that petitioner had fair notice of each

13  of the 20 counts charged against him and that he had a fair chance to challenge each charge

14  during his trial.  Petitioner does not argue otherwise.  Therefore, the court finds that this claim

15  lacks merit.

16    **B.    Imposition of Full, Separate, and Consecutive Sentences**

17    California Penal Code § 1170.1(a) requires that, except as otherwise provided by

18  law, the aggregate term of imprisonment for all consecutive sentences shall be the "sum of the

19  principal term, the subordinate term, and any additional term imposed for applicable

20  enhancements . . . ."  The principal term is the greatest term of imprisonment.  Subordinate terms

21  for each consecutive offense ". . . shall consist of one-third of the middle term of imprisonment

22  prescribed for each other felony conviction for which a consecutive term of imprisonment is

23  imposed. . . ."  Cal. Penal Code § 1170.1(a).  California Penal Code § 667.6(c) provides an

24  exception for certain sex offenses.  Specifically, the statute allows for "full, separate, and

25  consecutive" terms for each violation if the crimes involve the same victim or same occasion.

26  The trial court is empowered to determine whether the crimes involve the same victim or

1    occasion.  See Cal. Penal Code § 667.6(d).

2            At the outset, because petitioner was sentenced under California's determinate

3    sentencing law, the court addresses the impact of Cunningham v. California on this case.  In

4    Cunningham, the Supreme Court concluded that the determinate sentencing law is

5    unconstitutional to the extent it allows an aggravated term to be imposed based on facts

6    determined by the trial judge and not the jury because the middle-level term is the prescribed

7    statutory maximum.  See 127 S.Ct. at 871.

8            To the extent petitioner seeks federal habeas relief under the ruling in

9    Cunningham, the court concludes that such relief would not be available for two reasons.  First,

10   Cunningham does not apply retroactively to convictions which became final before it was

11   decided.  See Fennen v. Nakayema, ___ F. Supp. 2d ___, 2007 WL 1742339 (E.D. Cal., June 14,

12   2007); Rosales v. Horel, 2007 WL 1852186 (S.D. Cal., June 26, 2007); Salerno v. Schriro, 2007

13   WL 2153584 (D. Ariz., July 24, 2007).  In this case, petitioner's conviction became final in 2006,

14   before Cunningham was decided in January 2007.

15           Second, the rule announced in Apprendi and Blakely, and applied to the

16   determinate sentencing law in Cunningham, simply do not apply on the facts of this case.  Here,

17   petitioner was not sentenced to the aggravated term on any of the 20 counts.  Rather, as clearly

18   demonstrated by the state court's abstract of judgment, petitioner was sentenced to the low term

19   of three years on each count.  Nothing in Cunningham implicates the low term.  Further,

20   Cunningham does not address consecutive sentences.

21           The gravamen of petitioner's argument is that, by allowing the trial judge – not

22   the jury – to find facts which determine whether he would be subject to "full, separate, and

23   consecutive" sentences, § 667.6(d), as applied in this case, violates the constitutional right to trial

24   by jury under Blakely.  The court does not agree.  Under Apprendi, Blakely, and Cunningham,

25   any fact which increases the sentence beyond the statutory maximum must be determined by a

26   jury.  In this case, the abstract of judgment shows that petitioner was sentenced to the low term of

three years on each of the 20 counts.  Under § 667.6(d), the court added the 20 three-year terms

to arrive at the aggregate term of 60 years.  None of the individual terms was increased beyond

the low term of three years by virtue of any fact found by the judge in imposing "full, separate,

and consecutive" sentences under § 667.6(c).  Rather, application of § 667.6(d) merely allowed

the state court to add the full terms together.  Petitioner was not subject to an aggravated sentence

on any of the counts as a result of judicial fact-finding.

For these reasons, the court concludes that the state court's rejection of this claim

was neither contrary to nor an unreasonable application of United States Supreme Court

precedent.


## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.    Petitioner's petition for a writ of habeas corpus be denied; and

2.    The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days

after being served with these findings and recommendations, any party may file written

objections with the court.  The document should be captioned "Objections to Magistrate Judge's

Findings and Recommendations."  Failure to file objections within the specified time may waive

the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


DATED:   September 6, 2007.



CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE